## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## AT ATLANTA

| | | |
|---|---|---|
| **ROBERT G. STARRETT,** | ) | |
| | ) | **Civil Action No.** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **JURY DEMANDED** |
| | ) | |
| **THE CITY OF AUSTELL, GEORGIA,** | ) | |
| **AUSTELL POLICE DEPARTMENT, and** | ) | |
| **OLLIE B. CLEMONS, JR.** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## COMPLAINT
_____

Plaintiff, Robert G. Starrett, through counsel, hereby sues The City of Austell, Georgia, the Austell Police Department, and Mayor Ollie B. Clemons, Jr., for claims arising from his employment with The City of Austell, Georgia. For his cause of action, Plaintiff states as follows:

<u>PARTIES</u>

1.    Plaintiff, Robert G. Starrett ("Mr. Starrett"), is an adult citizen of the United States and resides in Douglas County, Georgia. Mr. Starrett was a "public employee" as defined by O.C.G.A. §45-1-4(a)(3).

2.    Defendant, The City of Austell, Georgia ("Austell") is the highest local government in the chain of command for the Austell Police Department and its

employees. Thus, Austell, GA operates as an arm of the City. Austell is also the owner and operator of a building located at 2721 Joe Jerkins Boulevard, Austell, Cobb County, Georgia, that houses the Austell Police Department. Austell is a "public employer" as defined by O.C.G.A. §45-1-4(a)(4).

3.      Defendant, Austell Police Department ("APD") at all times relevant to this Complaint was Plaintiff's employer under the organization of the City of Austell. APD is a "public employer" as defined by O.C.G.A. §45-1-4(a)(4).

4.      Defendant, Ollie B. Clemons, Jr. ("Mayor Clemons") is the current mayor of Austell, GA and was Mayor or Mayor *Pro tempore* of Austell at all times relevant to this Complaint and is sued in his individual capacity. Mayor Clemons was Mr. Starrett's "supervisor" as defined by O.C.G.A. §45-1-4(a)(6) *et al.*

## JURISDICTION AND VENUE

5.      Plaintiff brings this action under 42 U.S.C. 1983 and the First Amendment of the United States Constitution.

6.      This Court has jurisdiction pursuant to 28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States.

7.      This Court has jurisdiction pursuant to 28 U.S.C. §1343 (3) and (4), which give district courts jurisdiction over civil actions to secure civil rights extended by the United States government.

8.     This Court has jurisdiction pursuant to 28 U.S.C. 1367, which gives the district court supplemental jurisdiction over state law claims.

9.     Venue is appropriate in the judicial district under 28 U.S.C. 1391(b) because the events that gave rise to this Complaint occurred in the Northern District of Georgia.

## FACTUAL ALLEGATIONS

10.     Mr. Starrett was the Chief of Police of Austell, Georgia for almost 27 years before being forced out of his position by the City of Austell and Mayor Ollie B. Clemons.

11.     The Police Department of Austell, Georgia is housed, along with the 911 center, the jail, and the city's financial department, in a building located at 2721 Joe Jerkins Boulevard, Austell, Cobb County, Georgia.

12.     On or about August 21, 2018, Mr. Starrett was notified by his secretary, Diane Prince ("Ms. Prince") that the roof was leaking in the records area and that several ceiling tiles appeared to have water damage. Mr. Starrett was also notified by Sergeant Derek Horton ("Sgt. Horton") that there appeared to be damage to the ceiling caused by a roof leak.

13.     Mr. Starrett contacted then Community Affairs Director for Austell, Jim Graham ("Mr. Graham"), who oversaw building issues. Mr. Graham reported that he did not have time to deal with Mr. Starrett's problem and told him to call

someone else.  Mr. Starrett asked his Deputy Chief, Natalie Poulk ("Dep. Chief Poulk") to find someone to come out and inspect the roof.

14.    Mr. Starrett then contacted City Councilmember, Randy Green ("Councilman Green"), to notify him of the roof leaks and the potential water damage. Councilman Green was the police chair of the City Council of Austell and Mr. Starrett regularly reported issues at the police department to him.

15.    Mr. Starrett also reported the leak and water damage to then Mayor *Pro Tempore* Ollie B. Clemons.

16.    On or about September 11, 2018, Mr. Starrett spoke with Mayor Jerkins about the leaks and water damage at the police department. Mayor Jerkins authorized Mr. Starrett to consult with various vendors about repairing or replacing the roof of the police department. Mr. Starrett reported this to Mayor *Pro tempore* Clemons.

17.    On or about September 14, 2018, Mr. Starrett was notified that there was a snake loose in the police department. Several officers attempted to catch the snake, but it was able to escape into the wall. The wall was torn out, but the snake could not be located. The building was very humid. Mr. Starrett reported this to Mayor *Pro tempore* Clemons.

18.    On or about October 24, 2018, Mr. Starrett, Dep. Chief Poulk, Sgt. Horton and Captain Randy Henson ("Captain Henson") met with Eric Johnson, Doug Shaw, and Stan Copeland about the leaks and water damage to the police

department. As part of the meeting, everyone, along with Denise Sosebee ("Ms. Sosebee"), the head of the financial department, walked through and around the building as Mr. Starrett pointed out the various problems.

19.     Following this meeting, Mr. Starrett met with Mayor Jerkins and Pat Maxwell ("Chief Maxwell"), the Fire Chief of Austell to discuss the meeting with Stan Copeland, Doug Shawn and Eric Johnson. Mayor Jerkins notified Mr. Starrett that he had directed Mayor *Pro tempore* Clemons to come up with a solution to the leaks and water damage at the police department and to do "whatever it takes" to make the building safe. Mr. Starrett confirmed this with Mayor *Pro tempore* Clemons and Mayor *Pro tempore* Clemons promised to review the report from Mr. Starrett's meeting.

20.     The following day, October 25, 2018, Mr. Starrett was notified by Ms. Sosebee that her employees reported seeing rats and snakes in the building as well as various leaks. The employees also reported that it was very humid in the building.

21.     Mr. Starrett was also notified by Deborah Brown ("Ms. Brown"), 911 Supervisor, that she was concerned about her employees' working conditions. The 911 employees worked in a closed room and reported ceiling leaks, high humidity and poor air quality.

22.     Mr. Starrett notified Mayor Jerkins of what was going on. Mayor Jerkins instructed Mr. Starrett to notify Mayor *Pro tempore* Clemons. When Mr.

Starrett advised Mayor *Pro tempore* Clemons of these issues, Mayor *Pro tempore* Clemons stated that the building needed a "wrecking ball."

23.    On or about November 2, 2018, Mr. Starrett met with Councilman Green to bring him up to date on the problems with the building. Mr. Starrett also met with Ms. Sosebee to discuss the building problems and the proposal they had received for repairs. Mr. Starrett prepared a memo on these two meetings and provided it to Mayor *Pro tempore* Clemons via electronic mail and by leaving a copy in his mailbox. Mr. Starrett also notified Mayor *Pro tempore* Clemons to expect the memo. Mayor *Pro tempore* Clemons promised to review the memo.

24.    On or about November 7, 2018, Mr. Starrett attended a city-wide meeting of all department heads run by Mayor *Pro tempore* Clemons. The conditions of the APD's building was one of the issues discussed. The following day, Mr. Starrett briefed Mayor *Pro tempore* Clemons directly on the ongoing building issues.

25.    On or about November 27, 2018, Mr. Starrett prepared another memo regarding the ongoing building problems. A copy of the memo was e-mailed to Mayor *Pro tempore* Clemons and a hard copy was placed in his mailbox. The following day Mayor *Pro tempore* Clemons confirmed he received the memo. At that time, Mr. Starrett notified Mayor *Pro tempore* Clemons that leaks had been discovered around the building's foundation. Mayor *Pro tempore* Clemons told Mr. Starrett to contact Mr. Graham. Mr. Graham told Mr. Starrett to find someone to

inspect the problem. Mr. Starrett contacted Andy Black of Black's Foundation Waterproofing to inspect the damage.

26.    On or about November 30, 2018, Mr. Starrett met with Councilman Green at the police department. The two walked the property looking for where water was coming in. Councilman Green located what he believed to be black mold. Councilman Green recognized the seriousness of the situation and stated that something needed to be done immediately.

27.    That same afternoon, Mayor *Pro tempore* Clemons called a special meeting to discuss the building problems. Mayor *Pro tempore* Clemons, Ms. Sosebee, Mr. Graham, Chief Maxwell, Darrell Weaver ("Mr. Weaver") - assistant Community Affairs Director, and Mr. Starrett all attended the meeting. Mr. Starrett provided Mayor *Pro tempore* Clemons, Mr. Graham, and Mr. Weaver with copies of the reports he had received, and Mayor *Pro tempore* Clemons promised he would present the issue to the City Council that very night and appointed Mr. Graham to head the project.

28.    On or about December 15, 2018, Mr. Starrett met with Allen Martin ("Mr. Martin") of Elite Roofing. After inspecting the roof, Mr. Martin reported that the only thing that would correct the leaks would be to completely replace the roof of the police department building. Mr. Martin reported that the roof was installed

incorrectly when the building was built and that repairs would only be temporary and would not correct the problem.

29.    On or about December 18, 2018, Mr. Starrett met with Mayor *Pro tempore* Clemons to discuss Mr. Martin's findings. Mayor *Pro tempore* Clemons became upset when discussing the findings with Mr. Starrett and told him he "did not want to hear" about the issues and again stated that the building needed a "wrecking ball." After this meeting, Mr. Starrett walked through the building with Mayor *Pro tempore* Clemons, Mr. Graham and Mr. Weaver pointing out leaks and damage.

30.    On or about December 20, 2018, Mayor *Pro tempore* Clemons and Mr. Starrett met at the police department. Mr. Starrett climbed into the attic of the building and located five (5) leaks. Mayor *Pro* tempore Clemons was asked to come to the attic to inspect the roof with Mr. Starrett but declined. Mr. Starrett took pictures of the leaks and showed them to Mayor *Pro tempore* Clemons. Mayor *Pro tempore* Clemons yet again stated that the building needed a "wrecking ball."

31.    On or about December 26, 2018, Mr. Starrett notified Mayor Jerkins that air quality samples had been taken at the police department and were being sent off to check for mold. Mayor Jerkins again stated that Mayor *Pro tempore* Clemons had been directed to handle the situation.

32.     On or about December 30, 2018, Mr. Starrett came into the office to assist with cleaning Ms. Prince's office – the ceiling in her office had fallen, covering her desk and computer. There was major water damage in her office with the carpet being completely soaked through. Mr. Starrett's office was also damaged. Councilman Green came to the office to observe the damage and told Mayor *Pro tempore* Clemons that they needed to speak with a roofing company as soon as possible. Mayor *Pro tempore* Clemons reported that Mr. Graham would be handling things.

33.     Mr. Starrett contacted Mr. Weaver, Mr. Graham's assistant, to notify him of the damage. Mr. Weaver offered to have some fans brought in to help dry out the carpet but that was all he offered. Mr. Starrett declined and told him that they already had fans in place.

34.     Mr. Starrett then received a call from Mayor *Pro tempore* Clemons. Mayor *Pro tempore* Clemons told Mr. Starrett to keep Councilman Green and the other members of the City Council out of this matter because he was working on a solution. Mr. Starrett reminded Mayor *Pro tempore* Clemons that Councilman Green was the police chair and that he has always reported to him. Mayor *Pro tempore* Clemons told Mr. Starrett that he would be the chair over all departments from now on.

35.    The following day, Mr. Starrett contacted Mr. Weaver to notify him that the carpets were not drying, and they were beginning to smell.  Mr. Starrett then contacted Mayor *Pro tempore* Clemons. Mayor *Pro tempore* Clemons stated that Mr. Graham was out of the office but would do something about it upon his return.

36.    On or about January 2, 2019, a crew was finally brought into the building to remove the ruined carpet. When the carpet was removed it appeared that it had molded. Mr. Graham told Mr. Starrett to contact someone about the mold.

37.    The following day, Mr. Graham and Mr. Starrett met with Terry Caruthers ("Mr. Caruthers") of Rainbow International, a water damage restoration and mold removal service, at the police department. Mr. Caruthers pointed out visible mold growing on the wall and stated that since it had turned black, it was releasing spores into the air. Mr. Caruthers stated that this needed to be corrected immediately and began to look for other instances of mold in the building.

38.    That same day Mr. Caruthers brought in two crews to clean the area. Mr. Starrett had further air quality samples taken and gave them to Sgt. Horton to hand deliver to the lab. Mr. Caruthers stated that a roofer needed to be involved because the mold problem would continue unless the roof was replaced.

39.    Jim Lamb ("Mr. Lamb") of Alliance Roofing came out to inspect the building at the request of Mr. Caruthers. Mr. Lamb noted leaks in the attic area above the finance department, the records room, the attic area above the 911 center, the

area of Mr. Starrett's office, the area over Ms. Prince's office, the front side gutters, Dep. Chief Poulk's office, outside gutters, and a few light fixtures. Mr. Graham asked for proposals from Mr. Lamb and Mr. Caruthers.

40.    On or about January 9, 2019, the air quality sample report came back from the lab that showed the mold in the air was at dangerous levels. Mr. Caruthers stated that no one should be working inside the building without a mask or other protective equipment.

41.    On or about January 10, 2019, Mayor *Pro tempore* Clemons called a meeting to discuss the roof leaks. Mayor *Pro tempore* Clemons, Councilman Green, Mr. Graham, Mr. Weaver, Mr. Lamb and Mr. Caruthers were present for the meeting. When asked by Mayor *Pro tempore* Clemons what it would take to fix the room, Mr. Lamb reported that you "cannot fix an impossible situation" and told them that the whole roof needed to be replaced.

42.    Mr. Graham, Mr. Weaver and Mayor *Pro tempore* Clemons were more concerned with quick fixes instead of long-term repairs. Mayor *Pro tempore* Clemons approved a $5,000.00 temporary fix. Mr. Starrett stated that he believed this was a waste of money as it would not solve the problem in any real way.

43.    On or about January 12, 2019, Mr. Starrett was notified by Mr. Graham that several members of the Austell Police would be relocated to the Community Center while their offices were being cleaned. Mr. Starrett inspected their new

location and reported visible mold on the walls. Mr. Graham instructed Mr. Starrett not to report this to Mayor *Pro tempore* Clemons as the Mayor *Pro tempore* was "tired" of Mr. Starrett calling about the mold problem.

44.     On or about January 14, 2019, while at lunch with Mayor Jerkins, Mr. Starrett was asked about the move to the Community Center. Mr. Starrett reported the mold problems at the Community Center to Mayor Jerkins. Mayor Jerkins told Mr. Starrett to contact Mr. Graham about relocating from the Community Center to the Senior Center.

45.     After discussing the potential relocation with Mr. Graham, Mr. Starrett was contacted by Mayor *Pro tempore* Clemons. Mayor *Pro tempore* Clemons informed Mr. Starrett that he already had plans for the Senior Center and he forbade the Austell Police to relocate there. During this same conversation, Mayor *Pro tempore* Clemons asked Mr. Starrett to lie to the staff still working in the contaminated building by telling them that the mold was only in the downstairs area and that the people upstairs were "safe." Mr. Starrett told Mayor *Pro tempore* Clemons that everyone was aware of the mold in the attic and then reported the mold in the Community Center. Mayor *Pro tempore* Clemons made no comment and hung up on Mr. Starrett.

46.     On or about January 23, 2019, Mr. Starrett met with Mayor *Pro tempore* Clemons and Mr. Graham to discuss the continuing mold problem. Mayor *Pro*

*tempore* Clemons gave the staff an overview of the situation. In private, Mayor *Pro tempore* Clemons warned Mr. Starrett to not make a "big issue" of the mold because it was scaring the employees. Mr. Starrett notified Mayor *Pro tempore* Clemons that the employees were aware of mold issue and were complaining to him about it all the time.

47.    On or about February 4, 2019, Mr. Starrett met with Mayor Jerkins and Mayor *Pro tempore* Clemons. Mayor Jerkins asked Mayor *Pro tempore* Clemons about the mold problem. Mayor *Pro tempore* Clemons reported that they were working on it. Mayor Jerkins once again stressed to Mayor *Pro tempore* Clemons to "do whatever it takes" to fix the issues.

48.    On or about February 7, 2019, Mr. Starrett and Mr. Graham met with Mr. Caruthers about the mold issues. Mr. Caruthers reported that there was no solution to their mold problems until the roof leaks were repaired.

49.    On or about February 19, 2019, Sgt. Horton reported to Mr. Starrett that he and many other employees did not feel safe working in the building with the ongoing problems. Sgt. Horton reported that the staff believed the issues were not being corrected, merely covered up. At shift change, Mr. Starrett met with the 911 and jail employees who reported the same thing. In addition to their concerns that nothing was being corrected, they reported difficulty breathing and seeing visible black mold and dampness.

50.     The employees stated that they wanted to be examined by a physician.

51.     Mr. Caruthers was brought in to inspect the mold. Mr. Caruthers peeled back the wallpaper in Mr. Starrett's office and exposed black mold. Mr. Caruthers stated that the only way to correct the issue would be to tear out the wall completely. Mr. Starrett reported this to Mr. Graham and Mayor *Pro tempore* Clemons. Mayor *Pro tempore* advised Mr. Starrett to discontinue peeling the wallpaper.

52.     On or about February 20, 2019, Mr. Starrett again reported the continuing employee concerns to Mayor *Pro tempore* Clemons. Mayor *Pro tempore* Clemons told Mr. Starrett that he was tired of hearing about these problems.

53.     When Mr. Starrett expressed that the employees wanted to be examined by a doctor due to health concerns from being exposed to the mold, Mayor *Pro tempore* Clemons stated that was something that would not be reported to insurance. Mayor *Pro Tempore* was sure to stress to Mr. Starrett and Dep. Chief Poulk that no one would be allowed to file a worker's compensation claim regarding this matter.

54.     On or about February 26, 2019, the City Clerk asked Dep. Chief Poulk to provide a list of employees who wished to be examined by a doctor regarding mold exposure. The City Clerk was sure to stress that these examinations would not be reported to insurance and that Austell would be covering the costs.

55.     On or about March 1, 2019, Mr. Starrett, Ms. Prince, Dep. Chief Poulk and other employees underwent examination due to mold exposure. Employees that

did not wish to undergo examination were made to sign waivers stating that they would not take any action against Defendants and that Defendants would not be liable for any medical expenses or lost wages going forward. Following Mr. Starrett's examination, a First Report of Injury, or WC-1, was completed due to his ongoing breathing difficulties and shortness of breath. When Dep. Chief Poulk found out about this, she told Mr. Starrett that Mayor *Pro tempore* Clemons would be upset.

56.    On or about March 31, 2019, following a subsequent examination for the mold issues, Mr. Starrett notified Mayor *Pro tempore* Clemons that a First Report of Injury was filed. He also reported his concerns about his health and the health and safety of his staff. Mr. Starrett requested permission to discuss his health problems with the City Council. Mayor *Pro tempore* Clemons denied this, stating that he would notify the Council himself. Mr. Starrett told Mayor *Pro tempore* Clemons that he should have already notified the City Council of these important and serious issues and reminded Mayor *Pro tempore* Clemons that he had been promising to address these issues with the City Council for months and months.

57.    On or about April 26, 2019, Mr. Starrett met with Mayor Jerkins to discuss the building issues. Mayor Jerkins, yet again, said he would talk to Mayor *Pro tempore* Clemons about fixing the problems.

58.     On or about May 1, 2019, the ceiling fell in the 9-11 Center. The debris from the ceiling was wet and smelled stale and humid. Mr. Starrett reported this incident and the damage to Mayor *Pro tempore* Clemons and Mr. Weaver.

59.     On or about May 26, 2019, members of the APD were able to move back into the building from the Community Center after repairs had been made. Mr. Starrett notified Mayor *Pro tempore* Clemons that the building was still leaking. The following day, several staff members complained to Mr. Starrett about the ongoing mold and leak issues.

60.     On or about June 18, 2019, Mayor Jerkins retired, and Mayor *Pro tempore* Clemons was appointed Mayor of Austell.

61.     On or about October 13, 2019, Mr. Starrett reported to Mayor Clemons that there were leaks in the office and the ceiling tiles were noticeably damp. Mr. Starrett asked Mayor Clemons to look into replacing the roof or relocating the employees to another building. Mayor Clemons denied this request and told Mr. Starrett to contact Mr. Graham.

62.     Mr. Starrett contacted Mr. Graham. Mr. Graham told Mr. Starrett that he had spoken with Mayor Clemons and there was no room in the budget to make the requested repairs.

63.     On or about November 5, 2019, Mayor Clemons was elected as mayor of Austell.

64.    On or about February 10, 2020, employees approached Mr. Starrett with complaints about leaks and poor air quality. The employees also reported a bad and damp smell in the air. Mr. Starrett personally observed leaks in the 911 Center and contacted Mr. Weaver to let him know what was going on. Mr. Weaver stated that someone would look at it.

65.    On or about February 24, 2020, Mr. Starrett met with Mayor Clemons and reported that the building was still leaking. Mayor Clemons told Mr. Starrett that he did not want to hear about it.

66.    On or about June 8, 2020, during a meeting with command staff, Mr. Starrett was notified that there were several leaks being discussed by the staff. Mr. Starrett promised to discuss this with Mayor Clemons.

67.    On or about June 11, 2020, Dep. Chief Poulk and Sgt. Horton both lodged complaints about the leaks and the poor air quality in the building. Mr. Starrett reported these complaints to Mayor Clemons.

68.    On or about August 29, 2020, Mr. Starrett was notified that the ceiling fell in the jail area and that there appeared to be extensive water damage. Mr. Starrett assisted with the cleanup of the area and then contacted Mayor Clemons about the damage. Mayor Clemons had nothing to say but "the building is bad."

69.    Mr. Starrett continued to report leaks, water damage, mold, and air quality issues to Mayor Clemons, now his immediate supervisor.

70.     On or about February 25, 2021, Mr. Starrett was notified by Ms. Brown of more leaks and air quality issues in the 911 Center. Ms. Brown reported that even when it was not raining, the employees could see leaks coming from the ceiling over their computers. Mr. Starrett notified Mayor Clemons of these issues. Mayor Clemons became upset and told Mr. Starrett that he was "tired" of hearing about these issues.

71.     In an attempt to resolve this issue on this own, Mr. Starrett crawled into the ceiling over the 911 Center and installed a sheet of metal to divert water. Mr. Starrett also installed a dehumidifier and air cleaner in the 911 Center, but they proved too loud to be used.

72.     On or about March 16, 2021, Mr. Starrett reported to Mr. Weaver that Ms. Prince's office was leaking – again. Mr. Weaver said the building "needed to be demolished" and said he would notify Mayor Clemons.

73.     On or about March 25, 2021, Mr. Starrett spoke with Mayor Clemons about the leaks and the employee complaints. Mr. Starrett told Mayor Clemons that this had to stop and that a new building needed to be built as soon as possible. Mayor Clemons agreed that the building needed to be torn down.

74.     On or about March 30, 2021, Mr. Starrett was called to a meeting in Mayor Clemons' office. Mayor Clemons notified Mr. Starrett that he would no

longer be receiving the $500.00 per month vehicle allowance that had been provided to him by Mayor Jerkins.

75.     When Mr. Starrett asked why the vehicle allowance was being taken from him, Mayor Clemons told Mr. Starrett it was because he already had a city vehicle. Mr. Starrett explained to Mayor Clemons that Mayor Jerkins gave him the vehicle allowance to offset the K-9 pay that Mr. Starrett was not receiving. Mr. Starrett asked if he could now get the K-9 allowance since he would no longer receive the vehicle allowance. Mayor Clemons denied this request and the vehicle allowance was suspended.

76.     Just two days later, on or about April 1, 2021, Mr. Starrett, Dep. Chief Poulk and Captain Henson were all called into a meeting with Mayor Clemons. At the meeting, Mayor Clemons asked about their "goals" and then asked each of them when they planned to retire.

77.     During this meeting, Mayor Clemons seemed to become upset when he remembered that Mr. Starrett's wife was on the Austell Gas System Board ("Gas Board"). Mr. Starrett did not know why Mayor Clemons was upset by this – he had voted for Mr. Starrett's wife to be appointed to the Gas Board.

78.     On or about April 9, 2021, Mr. Starrett reported to Mr. Weaver that the building was still leaking and that he was getting complaints from his employees. Mr. Weaver reported that he was aware of the problems, and he was working on it.

79.     On or about June 3, 2021, Mr. Starrett contacted Mr. Weaver about the air quality in the building – several employees had complained. Mr. Weaver said that he was aware and that he was working on it.

80.     On or about June 17, 2021, Sgt. Horton complained to Mr. Starrett about a bad smell coming from one of the bathrooms and stated that other employees had complained as well. It was believed that this smell was related to the ongoing leak and mold problems. Mr. Starrett reported this to Mayor Clemons and told him that something had to be done because of the amount of complaints Mr. Starrett was receiving.

81.     On or about July 22, 2021, the office was cleared while it was treated for bugs and fleas. One of the workers treating the building told Mr. Starrett that the bugs were probably due to the high humidity and standing water. Mr. Starrett reported this to Mayor Clemons and once again stated that something needed to be done.

82.     On or about August 19, 2021, Dep. Chief Poulk notified Mr. Starrett of a leak in her office – water was coming through the light fixture. Leaks were also found in Ms. Prince's office, Mr. Starrett's office and the patrol room. Mr. Starrett took pictures of the leaks and forwarded them to Mr. Weaver. Mr. Weaver stated that the building needed to be torn down.

83.    On or about August 24, 2021, during a virtual department meeting, Mr. Starrett notified Mayor Clemons that the building was still leaking. Mayor Clemons stated that the only solution was a "wrecking ball."

84.    On or about August 25, 2021, Mr. Starrett received a call from Mr. Weaver. Mr. Weaver reported that the city was assessing the costs of moving and having the building demolished.

85.    On or about September 6, 2021, Mr. Starrett met with Sgt. Horton and a representative from the 911 Center. Both complained of the poor air quality and leaks throughout the building. Employees believed that nothing was being done to correct these issues. Mr. Starrett reported these issues to Mayor Clemons. Mayor Clemons said he would "look into it."

86.    On about September 8, 2021, a man came to the building saying he had been sent to collect mold samples from Dep. Chief Poulk's office and Ms. Prince's office. Mr. Starrett also instructed him to collect samples from the 911 Center and the training room as they both had visible leaks. The man taking samples informed police staff that he was only told to take samples in certain locations of the building. Upon information and belief, the most heavily molded areas of the building were not tested.

87.    On or about September 14, 2021, Mr. Starrett contacted Mayor Clemons about the mold samples. Mayor Clemons told Mr. Starrett that the samples were none of his concern and the problems were being taken care of.

88.    On or about September 16, 2021, Mayor Clemons met with Mr. Starrett, Dep. Chief Poulk, and Captain Henson regarding leadership. Mr. Clemons stated that he felt it was time to get in a "new direction" regarding leadership. After the meeting, Dep. Chief Poulk and Captain Henson both agreed that it seemed like Mayor Clemons was trying to get rid of Mr. Starrett.

89.    On or about September 20, 2021, several office staff members complained about the poor air quality to Mr. Starrett. Mr. Starrett said he would notify Mayor Clemons about this issue even though it was bound to upset him. One of the staff members told Mr. Starrett he "better watch out" for Mayor Clemons.

90.    This same day, Dep. Chief Poulk told Mr. Starrett that upon entering his office she felt like she could not breath and her eyes began to sting and water. Mr. Starrett told Dep. Chief Poulk that he was going to notify Mayor Clemons about what was going on.

91.    Mr. Starrett contacted Mayor Clemons and notified him about the poor air quality at the office. Mr. Starrett was of the opinion that they needed to relocate the employees because of the potential health hazards. Mayor Clemons stated that the city was looking into it.

92.     At this point, Mr. Starrett reminded Mayor Clemons that he was able to find almost half a million dollars to spend on a new office and two personal assistants for himself and asked if the cost had been approved by the City Council. Mr. Starrett also asked Mayor Clemons if the City Council had been made aware of the ongoing problems at the building because they must be made aware. Mayor Clemons did not respond and hung up on Mr. Starrett.

93.     Two days later, on or about September 22, 2021, Mayor Clemons told Mr. Starrett that he needed to retire because he did not want them to be "at odds."

94.     Mayor Clemons then called a meeting with Mr. Starrett, Dep. Chief Poulk, and Captain Henson. At this meeting, Mr. Starrett was ordered by Mayor Clemons to go home and force his wife to resign from the Gas Board.

95.     When Mr. Starrett asked Mayor Clemons why his wife had to resign from the Gas Board, he was given a myriad of reasons. At first, it was because Mr. Starrett's wife was supposedly being paid more per meeting than Mayor Clemons's wife who was on the Zoning Board. Then Mayor Clemons stated that it was a conflict of interest for Mr. Starrett's wife to serve on the Gas Board because Mr. Starrett worked for the city.

96.     Mr. Starrett refused to do as Mayor Clemons requested and reminded Mayor Clemons that Mayor Jerkins had personally asked Mr. Starrett's wife to be on the Gas Board and that Mayor Clemons had voted in favor of her appointment.

The City Council had also approved the appointment. All this took place while Mr. Starrett was an employee of Austell.

97.     Mr. Starrett told Mayor Clemons that he felt like he was being retaliated against and that this was highly improper and inappropriate.

98.     Mr. Starrett discussed these concerns with Councilman Green and Councilman Marlin Lamar ("Councilman Lamar").

99.     After this meeting with Mayor Clemons, Mr. Starrett spoke with Scott Kimbrough, the city attorney for Austell. Mr. Kimbrough confirmed that Mr. Starrett's wife serving on the Gas Board was not a violation or a conflict of interest.

100.    Mr. Starrett was also asked to add the costs of a traffic unit into the city budget at the request of Mayor Clemons. After the budget was approved by the City Council, Mr. Starrett was notified that the traffic unit costs had been removed by Mayor Clemons without approval of the City Council.

101.    In Fall 2021, Mr. Starrett was ordered to begin working from home by Mayor Clemons.

102.    Mr. Starrett, through counsel, contacted Mr. Kimbrough regarding the withdrawal of Mr. Starrett's K-9 allowance and unpaid comp time.

103.    After Mr. Kimbrough was made aware of these issues, the Georgia Bureau of Investigation ("GBI") opened an investigation regarding Mr. Starrett's K-9 unit.

104.   During this time, Mr. Starrett was not allowed to make any comments to the press. He could not provide context or defend himself from the stories being printed.

105.   Mayor Clemons also refused to issue any statement clarifying Mr. Starrett's status or defending him in any way.

106.   On or about December 13, 2021, Mr. Starrett received a call from Mayor Clemons giving him the option of being put on administrative leave or resigning. Mr. Starrett, after years of fighting for the health and safety of his employees and staff, chose to resign his position as of December 14, 2021.

107.   Upon his resignation, Mr. Starrett spoke with Mayor Clemons regarding his unpaid comp time, paid time off and sick leave. Just prior to Mr. Starrett being forced out, Fire Chief Maxwell left his position. Upon leaving, he was compensated for his unpaid comp time, paid time off and sick leave.

108.   Mayor Clemons promised that Austell would provide this compensation to Mr. Starrett. As of the filing of this Complaint, Mr. Starrett has not been compensated for 480 hours of unpaid comp time or his unused paid time off and sick leave.

109.   Over a three-year period, Mr. Starrett reported leaks, mold and air quality issues directly to Mayor Clemons no less than forty times, not counting the reports to Mayor Clemons's staff.

110.    After reporting these issues and others to Mayor Clemons, Mr. Starrett began experiencing retaliation that eventually led to him being forced out of his role as Chief of Police.

## VIOLATION OF PLAINTIFF'S FIRST AMENDMENT RIGHT TO FREE SPEECH PURSUANT TO 42 U.S.C. §1983

111.    Mr. Starrett incorporates and restates each of the above paragraphs as fully set forth herein.

112.    42 U.S.C. §1983 provides in pertinent part "that every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" *Id.*

113.    Mr. Starrett was a public employee.

114.    Mr. Starrett's complaints about the conditions of government buildings, employee working conditions, and misuse of government funds, all constituted speech on matters of public concern.

115.    Mr. Starrett reporting these matters of public concern lead to his employers retaliating against him, including reporting him to the GBI.

116.   Mayor Clemons ordered Mr. Starrett not to speak to members of the press or media regarding his concerns or to defend himself against the reports coming out about him.

117.   Mayor Clemons's order for Plaintiff not to speak to members of the press constituted an unlawful prior restraint on Plaintiff's Constitutional right to free speech under the First Amendment.

118. Defendants explicitly admonished Mr. Starrett's reporting and precluded him from further reporting.

119.   Defendants, in concert, established a prevalent, pervasive, and ongoing custom and policy of retaliatory and discriminatory conduct against Mr. Starrett for exercising his First Amendment freedom of speech, and the execution of this custom or policy caused injury to Mr. Starrett in the termination of his employment.

120.   Defendants' retaliation against Mr. Starrett as a commissioned law enforcement officer and civil servant, for his constitutionally protected activities is unlawful, unconstitutional, and a direct violation of Mr. Starrett's right of free speech.

121.   Pursuant to 42 U.S.C. 1988(b), in any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee as part of the costs.

122.   Wherefore Plaintiff asks this Honorable Court to find that under 42 U.S.C 1983 Defendants are liable for depriving Mr. Starrett of his rights, privileges, or immunities secured by the Constitution and law, namely the First Amendment. Furthermore, Mr. Starrett asks this Honorable Court to award attorney's fees as part of the costs of this proceeding pursuant to 42 U.S.C 1988.

## FIRST AMENDMENT RETALIATION PURSUANT TO 42 U.S.C. 1983

123.   Mr. Starrett restates and realleges each of the above paragraphs as through fully set forth herein.

124.   Defendants, acting individually and together, under color of law, acted to violate Mr. Starrett's right to freedom of speech, as protected under 42 U.S.C §1983 and the First Amendment of the United States Constitution.

125.   Mr. Starrett's complaints about the conditions of government buildings, employee working conditions, and misuse of government funds, all constituted speech on matters of public concern.

126. Mr. Starrett's interest in engaging in the speech outweighed Defendants' interests in prohibiting or suppressing the speech to promote the efficiency of the public services Defendants performed.

127.   Mr. Starrett's speech played a substantial part in Defendants' decision to subject him to suspension, reduction of benefits, and termination of his employment.

128.   Pursuant to 42 U.S.C 1988(b), in any action or proceeding to enforce a provision of sections 1981, 1981(a), 1982, 1983, 1985 and 1980 of this title, the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

129.   Wherefore Plaintiff asks this Honorable Court to find that under 42 U.S.C 1983 Defendants are liable for depriving Mr. Starrett of his rights, privileges, or immunities secured by the Constitution and law, namely the First Amendment. Furthermore, Mr. Starrett asks this Honorable Court to award attorney's fees as part of the costs of this proceeding pursuant to 42 U.S.C 1988.

VIOLATION OF O.C.G.A. §45-1-4 – GEORGIA WHISTLBLOWER ACT

130.   Pursuant to O.C.G.A. §45-1-4(d)(2) and (d)(3), the Georgia Whistleblower Act ("GWA"), it is unlawful for public employers to retaliate against employees "for disclosing a violation of or noncompliance with a law, rule, or regulation to either a supervisor or a governmental agency" or "for objecting to, or refusing to participate in, any activity, policy, or practice of the public employee that the public employee has reasonable cause to believe is in violation of or noncompliance with a law, rule, or regulation."

131.   Mr. Starrett continually and repeatedly reported to Defendants the deplorable and unsafe conditions of the building housing the Austell Police Department. Mr. Starrett's reporting constituted protected activities under the GWA.

132.   Mr. Starrett also reported issues pertaining to misuse of government funds and public officials failing to perform their duties.

133.   Defendants retaliated against Mr. Starrett because Mr. Starrett disclosed a violation or noncompliance of 29 U.S.C. § 654 (OSHA's "General Duty Clause")

134.   Defendants retaliated against Mr. Starrett because Mr. Starrett disclosed a violation or noncompliance of Sections 116 and 3412.1 of the 2012 International Building Code. The 2012 International Building Code has been adopted by the City of Austell. See City of Austell Code of Ordinances, Part II, Ch.8. Art. 1. Sec. 8.3 (Construction and Maintenance Codes Adopted).

135.   Defendants retaliated against Mr. Starrett because Mr. Starrett disclosed a violation or noncompliance of section 1509.2.4 of the 2012 International Building Code.

136.   Defendants retaliated against Mr. Starrett because Mr. Starrett disclosed a violation or noncompliance of section of section 304.7 of the 2012 International Property Maintenance Code.   The 2012 International Property Maintenance Code has been adopted by the City of Austell. See City of Austell Code of Ordinances, Part II, Ch.8. Art. 1. Sec. 8.3 (Construction and Maintenance Codes Adopted).

137.   Defendants retaliated against Mr. Starrett because Mr. Starrett disclosed a violation or noncompliance of the City of Austell Code of Ordinances, Part II, Ch. 2, Art. II, Sec. 2-23(6) (Mayor power and duties).

138.   Defendants are liable for all economic and non-economic damages resulting from its acts of retaliation.

139.   Mr. Starrett is entitled to reinstatement as well as restoration of all benefits of his employment lost as a result of his termination.

140.   If he prevails, Mr. Starrett is also entitled to recover his attorneys' fees and all other costs of litigation.

<u>VIOLATION OF THE FAIR LABOR STANDARDS ACT</u>

141.   The City of Austell's policies state that "Compensatory time is available to personnel if requested."

142.   During Mr. Starrett's employment, the City of Austell provided Mr. Starrett with compensatory time off ("comp time") in lieu of providing him with overtime compensation.

143.   Mr. Starrett accrued more than 480 hours of comp time.

144.   Upon the conclusion of Mr. Starrett's employment, Mr. Starrett was not paid his accrued comp time.

145.   Defendants APD and Austell were "employers" within the meaning of 29 U.S.C. §203(d). Thus, they were subject to the overtime pay requirements of the FLSA.

146.   The FLSA, 29 U.S.C. §201 et seq. requires employers to pay non-exempt employees at the minimum wage for all hours worked and one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek.

147.   The FLSA, 29 U.S.C. §201 et seq. States that nonexempt employees who work in "a public safety activity, emergency response activity, or seasonal activity" may accumulate "comp time" up to a maximum of 480 hours. Any work over 480 hours must be compensated at the overtime rate.

148.   Defendants violated the FLSA by allowing Mr. Starrett to accrue more than 480 hours of comp time.

149.   Defendants violated the FLSA by failing to pay Mr. Starrett for his comp time at the conclusion of his employment.

150.   Defendants' violations of the FLSA, set forth above, were willful.

151.   Mr. Starrett seeks damages in the amount of his unpaid overtime compensation, liquidated damages, interest, and other such legal and equitable relief as the Court deems just and proper.

152.   Mr. Starrett seeks recovery of attorneys' fees and costs to be paid by Defendant, as provided by the FLSA, 29 U.S.C. §216(b).

## DEFAMATION AND SLANDER

153.   Mr. Starrett alleges that Defendants are guilty of defamation and slander.

154.   Defendants contacted the GBI to have Mr. Starrett's K-9 department investigated after Mr. Starrett reported retaliation by Mayor Clemons.

155.   Upon information and belief, this investigation led to a number of news articles being published that included untrue and harmful information regarding Mr. Starrett.

156.   Mr. Starrett was forbidden from defending himself or speaking to the media on his behalf by Mayor Clemons.

157.   The actions of Defendants are damaging to Mr. Starrett's reputation and caused him to suffer personal humiliation and mental anguish.

158.   The statements made by Defendants are false as are the allegations they provided to the GBI.

159.   Defendants made these statements with reckless disregard for the truth.

160.   Defendants made these statements with malice.

## BREACH OF CONTRACT, UNJUST ENRICHMENT, PROMISSORY ESTOPPEL

161.   While Mr. Starrett was employed by the City of Austell, the City of Austell maintained a policy for reimbursing canine handlers for off-duty hours spent caring for and maintaining the canines. According to this policy, canine handlers would receive 10.5 hours extra pay per one-week pay period.

162.   In reliance on this policy, Mr. Starrett purchased a canine and trained her for police work.

163.   However, Mayor Ollie Clemons informed Mr. Starrett without warning that he would be discontinuing the canine reimbursement.

164.   After Mayor Ollie Clemons discontinued the canine reimbursement, Mr. Starrett continued to use the canine in police work and continued to care for and maintain the canine during off-duty hours.

165.   Mr. Starrett alleges that the City of Austell breached a contract to reimburse Mr. Starrett for off-duty time spent maintaining and caring for the canine.

166.   In the alternative, Mr. Starrett alleges that the City of Austell made a promise to reimburse Mr. Starrett for the off-duty time spent maintaining and caring for the canine and that Mr. Starrett reasonably relied on this promise in purchasing and training the canine. As such, Mr. Starrett alleges that the City of Austell is liable to Mr. Starrett under a theory of promissory estoppel.

167.   In the alternative, Mr. Starrett alleges that the City of Austell is liable to Mr. Starrett under a theory of unjust enrichment. Mr. Starrett purchased, trained, cared for, and maintained a canine for the Defendant's benefit and did not receive a corresponding benefit in return.

PRAYER

WHEREFORE, Plaintiff requests that this Honorable Court enter judgement against Defendants providing the following relief:

a.   Reinstatement of Plaintiff with back pay and such benefits as Plaintiff would have enjoyed had he not been terminated;

b.   If reinstatement is deemed inappropriate under the circumstances, that Defendants be ordered to compensate Plaintiff with at least three years of front pay;

c.   Reasonable attorney's fees under 42 U.S.C 1988 and O.C.G.A. §45-1-4(f);

d.   Compensatory damages to be determined by a jury of Plaintiff's peers after the trial of this matter;

e.   Lost wages and compensation, including back pay;

f.   Reasonable and necessary medical care and expenses in the past, present and future, including by not limited to, medical expenses, counseling expenses, and all health-related expenses;

g.     Mental anguish damages in the past, present and future;

h.     Such other and further relief to which Plaintiff may be entitled.

<u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action of all issues so triable.

Respectfully submitted,

**MASSEY & ASSOCIATES, P.C.**

*/s/ Joshua R. Ward*
R. Ethan Hargraves, GA No. 793839
Joshua R. Ward, GA No. 746261
6400 Lee Highway, Ste. 101
Chattanooga, TN 37421
Ph: 423.697.4529, F: 423.634.8886
ethan@masseyattorneys.com
josh@masseyattorneys.com
*Attorneys for Plaintiff*