UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT G. STARRETT.,

        Plaintiff

    v.

CITY OF AUSTELL, GEORGIA, et al.,

        Defendants.

CIVIL ACTION NO.

1:22-CV-3717-CAP

# **O R D E R**

This action is before the court on the defendants' motion for summary judgment [Doc. No. 58]. The plaintiff has filed a response in opposition [Doc. No. 65], and the defendants have filed a reply brief [Doc. No. 69]. The matter is now ripe for consideration.

## I. Statement of Facts and Procedural History

The plaintiff worked as the Police Chief for the City of Austell, Georgia for nearly 27 years. Defs.' Statement of Undisputed Material Facts ("DSMF"), ¶¶ 1, 67 [Doc. No. 58-1]. For all but approximately the last two years of the plaintiff's employment, he worked under Mayor Joe Jerkins. Pl.'s Statement of Additional Material Facts ("PSMF") ¶ 1 [Doc. No. 67]. Although the Police Department building exhibited various issues for many years, in 2018, the

presence of mold was detected, and, according to the plaintiff, he began reporting the situation to his superiors. PSMF ¶ 3.

Beginning in November 2018, the plaintiff submitted written memos to then-Mayor Pro-Tem Ollie Clemons reporting the building issues; he reported in January 2019 that the building conditions were causing health hazards for him and his employees. PSMF ¶¶ 7-8. The plaintiff claims it was at this point that the plaintiff perceived problems between himself and Clemons. PSMF ¶¶ 8.

On November 2, 2018, the plaintiff updated Randy Green, a City Council member and Chair of the Police Committee, about the problems with the police department building. PSMF ¶¶ 13-14. Green was a member of the City Council and also the Chair of the Police Committee. PSMF ¶ 14. Clemons expressed displeasure and frustration toward the plaintiff for involving Green PSMF ¶ 15.

On December 30, 2018, the plaintiff asked Clemons if he could report the ceiling collapse in the police department building to the City Council; Clemons told the plaintiff not to do so, indicating that he (Clemons) would do it. PSMF ¶ 16. In March 2019, the plaintiff requested to be able to tell the City Council about his health issues related to the mold in the building and Clemons again denied his request said that he (Clemons) would talk to the

Council. PSMF ¶ 17. Clemons never relayed the reports to the City Council. *Id.* at ¶ 18.

In November 2019, Clemons was formally elected major. DSMF ¶ 18. In March 2021, it was brought to Clemons's attention by other department directors that the plaintiff was receiving a car allowance despite also having been issued a City take-home vehicle. DSMF ¶ 20. Clemons met with the plaintiff in March 2021, and informed him that he could not have both a city vehicle and a car allowance. *Id.* at ¶ 22. Shortly thereafter Clemons instructed Finance Director Denise Lowe to discontinue the plaintiff's car allowance. *Id.* at ¶ 23. The plaintiff testified that he was given a car allowance by former Mayor Jerkins in lieu of K-9 pay. *Id.* ¶¶ 24 & 26.

Clemons testified that he was not willing to allow department directors, including the plaintiff, to continue to operate with as much autonomy and lack of oversight as his predecessor, Mayor Jerkins, and, in Clemons's view, this caused the relationship between himself and the plaintiff to decline. Clemons Aff. at ¶ 17 [Doc. No. 57-7]. Furthermore, Clemons believed that there were inadequacies in the Austell Police Department leadership, and that there was room for improvement. DSMF ¶ 33. Specifically, Clemons identified the following negative aspects of the plaintiff's leadership: micro-managing small or insignificant issues; failure to pursue certification for the Police Department and the plaintiff's infraction on September 9, 2021 of

3

crossing jurisdictional lines to pursue a criminal, which potentially opened the City to liability for these issues. *Id.* at ¶ 34.

On April 1, 2021, the plaintiff, Clemons, then-Deputy Chief Natalie Poulk, and then-Captain Randy Henson held a meeting related to succession planning within the Police Department to discuss whether any officers were being trained and prepared to qualify to fill any Command Staff positions that would necessarily become open following anticipated retirements. *Id.* at ¶ 36. This discussion included the plaintiff's position of Chief of Police; the plaintiff was asked what steps he had taken to prepare Poulk to take over the position of Chief of Police, such as additional training and classes. *Id.* at ¶ 37. On September 22, 2021, the plaintiff told Clemons that the earliest he wanted to retire was January 21, 2022; Clemons agreed to that retirement date. *Id.* at ¶ 41. In fact, on this same date, the plaintiff stated that he had begun removing his personal effects for the previous three nights because he was already planning for retirement. *Id.* at ¶ 42.

In late September 2021, Clemons informed the plaintiff that he would start working from home on a special project until his retirement date in late January 2022 so that Poulk could receive some experience performing duties as acting Police Chief. *Id.* at ¶ 43. Poulk was named acting Police Chief on September 27, 2021, but the plaintiff still held the title of Police Chief, and received his full benefits and salary. *Id.* at ¶ 44-45. When his at-home

assignment began, the plaintiff's city vehicle was reassigned to Poulk. *Id.* at ¶ 45.

On November 17, 2021, a news reporter sent the Police Department an Open Records Act request for all veterinary bills paid for by the Police Department. *Id.* at ¶ 48. Poulk attempted to obtain the bills from Bullard Animal Hospital ("Bullard") but it refused to cooperate. *Id.* at ¶ 49. Ultimately, Poulk contacted the GBI and requested that it investigate why Bullard would not release the records. *Id.* at ¶ 52.

According to Poulk, because the plaintiff exclusively controlled and managed the Police Department's K-9 unit for many years, the GBI was interested in speaking with the plaintiff regarding Bullard's refusal to submit records for the Open Records Act request. Poulk Aff. ¶¶ 5-7 [Doc. No. 57-5]. Poulk further stated that after she requested the vet bills from Bullard, the plaintiff called her and angrily told her those bills were none of her business. *Id.* at ¶ 8.

On December 10, 2021, then-Speaker of the House David Ralston wrote a letter informing the plaintiff that he was removed from the Georgia Access to Medical Cannabis Commission. DSMF ¶ 62. According to Clemons, he saw a video of Ralston explaining that he removed the plaintiff from the Commission because the GBI investigation needed his full attention. *Id.* at

63.[1] At that point, Clemons decided to place the plaintiff on administrative leave with pay pending the results of the GBI investigation. *Id.* at ¶ 64. On December 13, 2021, Clemons called the plaintiff and told him that he was going to be placed on administrative leave with pay. *Id.* at ¶ 65.

According to the plaintiff, he heard Clemons ask the City Clerk if the plaintiff could resign rather than be placed on administrative leave. Pl. Dep. at ¶ 127. Because he did not want to tarnish his clean record of 46 years in service by ending it on administrative leave, the plaintiff believed had no choice but to resign. PSMF ¶¶ 50-51. The plaintiff submitted a letter of resignation the following day. *Id.* at ¶ 54

The plaintiff filed suit on September 22, 2022 [Doc. No. 1], asserting claims for (1) violation of his First Amendment right to free speech; (2) retaliation for the exercise of his First Amendment right to free speech; (3) violation of the Georgia Whistleblower Act; (4) violation of the Fair Labor Standards Act ("FLSA"); (5) defamation and slander; (6) breach of contract; and (7) unjust enrichment and promissory estoppel.

---

[1] Notably, the plaintiff testified that he requested his own removal from the Commission. Pl. Dep. at 121-22. However, he does not dispute that Clemons saw a video in which Ralston linked the plaintiff's removal from the Commission to issues relating to the GBI investigation. DSMF ¶ 63; Pl.'s Resp. to Defs.' Statement of Material Facts ("PRDSMF") ¶ 63 [Doc. No. 66].

## II. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedure authorizes summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the burden of demonstrating that no dispute as to any material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 156 (1970); *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). The moving party's burden is discharged merely by "showing—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether the moving party has met this burden, the district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson*, 74 F.3d at 1090. Once the moving party has adequately supported its motion, the nonmovant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, it is not the court's function to decide issues of material fact but to decide only whether there is such an issue to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251

(1986). The applicable substantive law will identify those facts that are material. *Id.* at 247. Facts that in good faith are disputed, but which do not resolve or affect the outcome of the case, will not preclude the entry of summary judgment as those facts are not material. *Id.* Genuine disputes are those by which the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* "Genuine" factual issues must have a real basis in the record. *See Matsushita*, 475 U.S. at 586. When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Id.* (citations omitted).

## III. Analysis

### A. Federal Claims

#### *1. FLSA Claim*

The defendants moved for summary judgment on the plaintiff's FLSA claim, arguing that the plaintiff was properly classified as an exempt employee. [Doc. No. 58-2] at 12-15. The plaintiff did not oppose summary judgment on this issue. Accordingly, the defendants are entitled to judgment as a matter of law on the plaintiff's FLSA claim.

#### *2. First Amendment Claims*

The First Amendment of the U.S. Constitution provides: "Congress shall make no law ... abridging the freedom of speech." U.S Const. amend. I.

The plaintiff bring her First Amendment claims through 42 U.S.C. § 1983, under which Congress has authorized civil actions for deprivation of rights:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. "To prevail on a claim under § 1983, a plaintiff must demonstrate both (1) that the defendant deprived [him] of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." *Arrington v. Cobb Cnty.*, 139 F.3d 865, 872 (11th Cir. 1998).

### (a) Prior Restraint

In his complaint, the plaintiff alleges that Clemons ordered him not to speak to members of the press or media regarding the GBI investigation about the Police Department's K-9 unit. Compl. at ¶ 116. The plaintiff contends this directive was an unlawful prior restraint on his free speech rights. *Id.* at ¶ 117.

The government as employer has a stronger interest in regulating the speech of its employees than in regulating the speech of the citizenry in general. *Connick v. Myers*, 461 U.S. 138, 140 (1983). Nevertheless, "[a] public employee does not relinquish First Amendment rights to comment on matters

of public interest by virtue of government employment." *Id.* (citing *Pickering v. Bd. of Educ,* 391 U.S. 563 (1968)). The First Amendment protects government employee speech if the employee speaks "as a citizen upon matters of public concern." *Id.* at 147. However, if the employee speaks "as an employee upon matters only of personal interest," the speech is not constitutionally protected. *Id.* Therefore, the Court must decide (1) if the plaintiff spoke as a citizen, and (2) whether his speech was a matter of public concern. *Boyce v. Andrew*, 510 F.3d 1333, 1342 (11th Cir. 2007) (citing *Connick* and *Pickering*).

The defendants move for summary judgment on the plaintiff's claim of an unlawful prior restrain, arguing that the plaintiff cannot establish that he was speaking on a matter of public concern. With respect to the public concern determination, the court examines "'the content, form, and context' of the speech, 'as revealed by the whole record.'" *Carter v. City of Melbourne*, 731 F.3d 1161, 1168 (11th Cir. 2013) (quoting *Connick*, 461 U.S. at 147-48). A public employee's speech involves a matter of public concern if it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (quoting *Connick*, 461 U.S. at 146). Public concern "is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of

publication." *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004). However, when the purpose of the speech is to further the speaker's own private interest, as opposed to raising a matter of public concern, there is no constitutional protection. *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993).

Here, the only allegation of an unlawful prior restraint is the direction to not speak with the media about the ongoing GBI complaint. Compl. ¶ 117. But the allegation in the complaint is that this action prevented the plaintiff from defending <u>himself</u>—thus, by the plaintiff's own allegation, the speech he was prevented from making was to serve own personal interest. In response to the motion for summary judgment, the plaintiff does not argue otherwise. Instead, he attempts to change his prior restraint claim to encompass other instances when he was told not to report certain facts to the City Council. [Doc. No. 65] at 13-14. In this circuit, however, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Accordingly, the defendants are entitled to summary judgment on the plaintiff's prior restraint claim.

(b) <u>Retaliation</u>

In his complaint, the plaintiff alleges that his speech "played a substantial part in [the d]efendants' decision to subject him to suspension, reduction of benefits, and termination of his employment." Compl. at ¶ 127. A

11

public employer may not take an adverse action against an employee in response to speech protected by the First Amendment. *Alves v. Bd. of Regents*, 804 F.3d 1149, 1159 (11th Cir. 2015) (citing *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989)).

(i) Adverse Employment Action

As an initial matter, the defendants argue that there was no adverse action taken against the plaintiff because he voluntarily resigned.[2] In response, the plaintiff argues that because he was threatened with administrative leave pending the GBI investigation, he felt he had no choice except to resign.

In *Hargray. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995), the Eleventh Circuit explained its standard for evaluating whether an employee's resignation amounts to constructive discharge as follows:

---

[2] In the motion for summary judgment, the defendants argue that the plaintiff's allegations of suspension and reduction of benefits are not supported by the record. [Doc. No. 58-2], 22. In response to the motion for summary judgment, the plaintiff addresses only the imposition of administrative leave and termination. [Doc. No. 65], 17-18. While the plaintiff cites to his own testimony that administrative leave would tarnish his otherwise clean record of 46 years in law enforcement, an "employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001) (holding that "to prove adverse employment action . . . an employee must show a serious and material change in the terms, conditions, or privileges of employment.") (*overruled on other grounds as recognized by Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008)).

[E]mployee resignations are presumed to be voluntary. *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1544 (8th Cir. 1992); *Alvarado v. Picur*, 859 F.2d 448, 453 (7th Cir. 1988); *Christie v. United States*, 518 F.2d 584, 587 (Ct. Cl. 1975). "This presumption will prevail unless [the employee] comes forward  with sufficient evidence to establish that the resignation was involuntarily extracted." *Christie*, 518 F.2d at 587. Those circuits that have addressed whether a resignation was involuntary agree that the court must examine the surrounding circumstances to test the ability of the employee to exercise free choice. *See Angarita*, 981 F.2d at 1544; *Parker v. Bd. of Regents*, 981 F.2d 1159, 1162 (10th Cir. 1992); *Alvarado*, 859 F.2d at 453–54; *Stone v. University of Md. Medical Sys. Corp.*, 855 F.2d 167, 173 (4th Cir. 1988); *Scharf v. Dep't of the Air Force*, 710 F.2d 1572, 1574 (Fed. Cir. 1983); *Christie*, 518 F.2d at 587.

The relevant cases reveal that there are two situations in which an employee's resignation will be deemed involuntary . . .  (1) where the employer forces the resignation by coercion or duress, *see, e.g., Schultz v. United States Navy*, 810 F.2d 1133, 1135–37 (Fed. Cir. 1987); or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee, *see, e.g., Scharf*, 710 F.2d at 1574–76; *Covington v. Dep't of Health & Human Serv.*, 750 F.2d 937, 942–44 (Fed. Cir. 1984).

The plaintiff does not allege that he was deceived or presented with any misrepresentation. Rather, he argues that he was "forced" to resign. [Doc. No. 65], 19.

In *Hargray*, the Eleventh Circuit held that "[u]nder the coercion or duress theory, we consider whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign." 57 F.3d at 1568. The court then

set forth a list of factors to consider in determining whether a resignation was voluntary:

> (1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel.

*Id.*

To support his contention that he was forced to resign, the plaintiff cites to his own testimony in which he said he believed he had no choice other than to resign because he did not want to tarnish his clean record of 46 years in service by ending it on administrative leave. *See* Pl. Dep. at 125-127, 136 [Doc. No 57-1].

"'[R]esignations can be voluntary even where the only alternative to resignation is facing possible termination for cause or criminal charges. *Pitt v. United States*, 420 F.2d 1028 (U.S. Ct. Cl. 1970). Resignations obtained in cases where an employee is faced with such unpleasant alternatives are nevertheless voluntary because 'the fact remains that plaintiff had a choice. [The plaintiff] could stand pat and fight.'" *Hargray*, 57 F.3d at 1568, quoting *Christie*, 518 F.2d at 587. Importantly, "the assessment [of] whether real alternatives were offered is gauged by an objective standard rather than by the employee's purely subjective evaluation; that the employee may perceive

his only option to be resignation . . . is irrelevant.' *Stone*, 855 F.2d at 174. *See Christie*, 518 F.2d at 587–88. Moreover, 'the mere fact that the choice is between comparably unpleasant alternatives . . . does not of itself establish that a resignation was induced by duress or coercion, hence was involuntary." *Hargray*, 57 F.3d at 1568 (*quoting Stone*, 855 F.2d at 174). The plaintiff has failed to point to any evidence in the record—aside from his own subjective beliefs—that serving an administrative leave pending the GBI investigation would tarnish his record.

As to the four remaining factors, the plaintiff claims he was not given a reasonable amount of time in which to choose, he was not permitted to select the effective date and he was not given an opportunity to consult with an attorney.[3] [Doc. No. 65], 19. Yet, the plaintiff points to no evidence that he requested additional time or an opportunity to consult an attorney. *See Ross v. City of Perry, Ga.*, 396 Fed. App'x 668, 670 (11th Cir. 2010) (finding resignation voluntary where employee could have asked for more time but did not). While it is true that the plaintiff was not permitted to select the effective date of resignation, all other factors reveal that the circumstances under which the plaintiff resigned were not coercive. As such, the defendants are entitled to summary judgment on the plaintiff's retaliation claim.

---

[3] The plaintiff does not argue that he did not understand the nature of the choice he was given.

(ii) <u>Same Action Absent Protected Speech</u>

Even if the plaintiff could establish that he was coerced into resigning, he has failed to refute the defendants' argument that the same employment decision would have been made even in the absence of the plaintiff's protected speech. It is undisputed that Mayor Clemons made the decision to place the plaintiff on administrative leave with pay pending the results of the GBI investigation after he learned that the plaintiff was removed from the Georgia Access to Medical Cannabis Commission due to a conflict concerning the GBI investigation. DSMF ¶¶ 62-64; PRDSMF ¶¶ 62-64.

In response to the defendants' motion for summary judgment on this point, the plaintiff argues that "it was abnormal for department directors, such as [the plaintiff], to be placed on administrative leave." The plaintiff concludes that "[t]his significantly undermines [the d]efendants' contention that it (sic) would have made the same decision absence [the plaintiff's] speech, and certainly rises to the level of a jury question." [Doc. No. 65], 22. The plaintiff does not explain how or why his conclusory characterization of "abnormal" practices creates a jury question. Nevertheless, it is undisputed that the incident involving another department director who the plaintiff contends was subject to a GBI investigation[4] occurred during the prior

---

[4] Notably, the evidence does not support the plaintiff's contentions with respect another department director who was treated differently. He claims,

mayoral administration. "Lowe Dep". at 104 [Doc. No. 62]. Therefore, to the extent the plaintiff is alleging that he was treated differently from another similarly situated employee, he fails to establish that he was similarly situated to that employee.

In sum, the plaintiff has failed to point to evidence that refutes the defendants' claim that the decision would have been made regarding the plaintiff's administrative leave regardless of any protected speech. Accordingly, the defendants are entitled to summary judgment on the plaintiff's retaliation claim.

### B. State Law Claims

Even with the resolution of the plaintiff's federal law claims, this court maintains supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). However, in accordance with 28 U.S.C. § 1367, the court "may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367(a) ] if ... [it] has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged

---

"at least one other department director had been in a situation similar to [the plaintiff's] and yet was not placed on administrative leave." [Doc. No. 65], 21. That other department director was Denise Lowe. *See* PSMF ¶¶ 57-59. But Lowe testified that she was unaware of a GBI investigation; she describes an incident where she made a mistake in a single transfer of funds and when it was brough to her attention, she immediately transferred it back. Lowe Dep. at 84.

district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial."). As explained *supra*, the plaintiff's FLSA and § 1983 claims have been disposed of on summary judgment. Therefore, the court declines to exercise supplemental jurisdiction over the plaintiff's state law claims. Accordingly, to the extent it seeks summary judgment on the plaintiff's state law claims, the defendants' motion for summary judgment [Doc. No. 58] is hereby **DISMISSED IN PART AS MOOT**.

## IV. Conclusion

As set forth above, the defendant's motion for summary judgment is **GRANTED IN PART and DISMISSED IN PART AS MOOT**. The defendants are entitled to judgment as a matter of law with respect to the plaintiff's federal claims. The court declines to exercise supplemental jurisdiction over the plaintiff's state law claims; those claims are **DISMISSED WITHOUT PREJUDICE**.

The clerk is **DIRECTED** to terminate this civil action.

**SO ORDERED**, this 1st day of April, 2024.

/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge